**INSURANCE & CONSULTING
ASSOCIATES, LLC,
Plaintiff,**

v.

**ITT HARTFORD INSURANCE GROUP:**
Hartford Fire Insurance Co., Hartford Casualty Insurance Co., Hartford Underwriters Insurance Co., Twin City Fire Insurance Co., Hartford Insurance Co. of the Midwest, Trumbull Insurance Co., Defendant.

No. 97–0246–CV–W–BC.

United States District Court,
W.D. Missouri,
Western Division.

Jan. 20, 1999.

Louis C. Accurso, The Accurso Law Firm, Kansas City, MO, Charles H. McKenzie, Frederick J. Ernst, The Accurso Law Firm, Kansas City, MO, for Ins. & Consulting Associates, LLC.

William H. Colby, Matthew E. Turner, Shook, Hardy & Bacon, Kansas City, MO, for ITT Hartford Insurance Group, Hartford Fire Insurance Co., Hartford Casualty Insurance Co., Hartford Underwriters Insurance Co., Twin City Fire Insurance Co., Hartford Insurance Co. of the Midwest, and Trumbull Insurance Co.

Fred Wilkins, Wilkins & Millin, P.C., Kansas City, MO, William H. Colby, Matthew E. Turner, Shook, Hardy & Bacon, Kansas City, MO, Stephen B. Millin, Wilkins & Millin, P.C., Kansas City, MO, for Excel Corporation.

Niles S. Corson, Robert T. Adams, William H. Colby, Matthew E. Turner, Shook, Hardy & Bacon, Kansas City, MO, for Hartford Fire Insurance Company, Hartford Casualty Insurance Company, The Hartford Underwriters Insurance Company.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LARSEN, United States Magistrate Judge.

Before the court is defendant's motion for summary judgment. I find that (1) under the facts of this case and Missouri law, plaintiff has no cause of action for breach of contract against defendant; (2) plaintiff provided no consulting services to or on behalf of defendant that would give rise to a claim in quantum meruit; (3) plaintiff has failed to establish a wrongful act under statute or the common law that could form the basis for a claim of tortious interference with contract; and (4) plaintiff has failed to establish an unlawful objective for purposes of its claim of civil conspiracy. Therefore, defendant's motion for summary judgment will be granted.

## I. BACKGROUND

On January 29, 1997, plaintiff filed a six-count complaint in the Circuit Court of Jackson County, Missouri, alleging as to defendant one count of breach of contract, one count of interference with business relationship, one count of civil conspiracy, and one count seeking exemplary damages. Two additional counts involved a second defendant no longer in the case [1]. On March 4, 1997, this action was removed to federal district court on the basis of diversity of citizenship.

On April 9, 1998, plaintiff filed its First Amended Complaint, incorporating as additional claims against defendant a second count for breach of contract and a count sounding in quantum meruit.

On June 25, 1998, defendant filed a motion for summary judgment as to all counts. Plaintiff filed its suggestions in response on August 14, 1998. On September 14, 1998, defendant filed its reply suggestions, in which it directed the court's attention to a decision of the Missouri Court of Appeals issued after the date of plaintiff's suggestions in opposition. Plaintiff filed supplemental suggestions on September 28, 1998, in which it addressed the newly decided case, and on October 8, 1998, defendant filed a supplemental reply.

## II. STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c), Federal Rules of Civil Procedure, a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

1. A stipulation of dismissal was filed as to defendant Excel Corporation on December 8, 1998, and on December 11, 1998, an order of dismissal was entered.

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The key to determining whether summary judgment is proper is ascertaining whether there exists a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. *American Academy of Family Physicians v. United States,* 75 A.F.T.R.2d 95-1709 (W.D.Mo.1995), *aff'd* 91 F.3d 1155 (8th Cir.1996).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. *Disesa v. St. Louis Community College,* 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine. A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Id.* at 255, 106 S.Ct. 2505. If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted. *Id.* at 249–250, 106 S.Ct. 2505.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. The trial judge then determines whether a trial is needed—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

## III. UNCONTROVERTED MATERIAL FACTS

1. Plaintiff Insurance and Consulting Associates ("ICA"), is a Missouri independent insurance agency that at all relevant times had its principal place of business at 1600 Genesee, Kansas City, Missouri.

2. One of the agents at ICA during the relevant time period is Charles M. Young. ICA writes most of its insurance business through Fireman's Fund and through defendant Hartford.

3. Excel Corporation is a livestock processor with its principal place of business at 151 N. Main Street, Wichita, Kansas. As a livestock processor, Excel slaughters cattle and hogs and processes the meat products.

4. During the relevant time period, Excel operated three hog processing plants located in Ottuma, Iowa; Beardstown, Illinois, and Marshall, Missouri.

5. Don Jones was the director of hog procurement for Excel during the time that he had dealings with ICA. Jones had become the director of hog procurement

for Excel in October of 1990 and was located in Wichita, Kansas.

6. During all relevant time periods, Jones, as director of hog procurement for Excel, had the authority to select the insurance carriers and/or the insurance agents with whom to work to provide insurance coverage for Excel's hog operations.

7. Hartford is a group of individual insurance companies, each having its principal place of business in Hartford, Connecticut.

8. On March 15, 1995, ICA and Hartford entered into an Agency Agreement.

9. The Agency agreement gives ICA the authority to solicit insurance for business on behalf of Hartford and to issue policies authorized by Hartford. The Agency Agreement further states Hartford will pay ICA commissions on insurance placed by ICA.

10. The Agency Agreement provides Hartford has the right to cancel at any time any policy placed by ICA with Hartford.

11. The Agency Agreement contains no specific provision regarding the commission rate on the livestock insurance policies with Excel, but Young states he was informed by Hartford that the commission rate at the relevant time period on the insurance placed with Excel would be 12%.

12. The Agency Agreement between ICA and Hartford has not been terminated.

13. ICA continues to sell other policies issued by Hartford to companies.

14. As part of Excel's hog processing business, Excel had livestock insurance policies from Hartford insuring against the loss of hogs while in transit from the hog producers to Excel's hog processing plants.

15. A separate policy of livestock insurance was issued by Hartford to each of Excel's three hog processing plants.

16. Jones testified that to his knowledge Excel always had its livestock insurance with Hartford.

17. Until April 1, 1996, Packer's was Excel's insurance agent with regard to Hartford's livestock insurance for the three hog processing plants operated by Excel. During the relevant time, Packers was shown as the agent on Excel's livestock insurance policies issued by Hartford.

18. Keith Olson was the Packers agent for Excel account during all relevant periods of time prior to April 1996.

19. During the relevant time period, Excel's livestock insurance, placed by Packers, was with Hartford.

20. The livestock insurance is obtained by Excel in order to protect the hog producers from losses while the hogs are in transit to Excel's processing plants. The monthly premiums for the livestock insurance are collected by Excel from the producers and remitted to Hartford.

21. In August or September of 1994, Young, who at that time was with Jardine Insurance Brokers, first contacted Jones at Excel about the possibility of handling Excel's livestock insurance program.

22. In December 1994, Young left Jardine and, with a group of other individuals, started ICA.

23. Young claims that in August or September 1994 he began developing an insurance program for Excel at Jones' request.

24. The livestock insurance program Young and ICA developed between September of 1994 and February of 1996 sought for Excel to change insurance companies from Hartford to Fireman's Fund.

25. Young and ICA also worked on another insurance program for Excel that would have involved Munich Reinsurance.

26. Young admits that the time he claims he worked on putting together an insurance program for Excel was not done

on Hartford's behalf and that if Excel had elected to adopt the plan and change insurance from Hartford to Fireman's Fund, it would have been directly contrary to Hartford's interest.

27. In February 1996, Jones informed Young that Excel did not want to change its livestock insurance from Hartford to Fireman's Fund.

28. By letter dated February 27, 1996, Young, on behalf of ICA, stated he regrets Excel did not want to change insurance programs from Hartford to Fireman's Fund. Young also informs Excel that ICA is a licensed agent for Hartford and requests Jones to consider appointing ICA as agent of record on Excel's livestock transit insurance program and attached a sample agent of record letter.

29. By letter dated March 21, 1996, Jones appointed ICA, Excel's agent of record with respect to Excel's livestock insurance program.

30. Jones felt Young pressured him to appoint ICA as Excel's agent of record. Jones testified that "primarily it comes down to one thing. Mike put a lot of pressure on to get that done, so I did it. That is what it comes down to."

31. The March 21, 1996, agent of record letter provided by Jones does not provide a specific time period during which ICA was to remain Excel's agent of record and clearly provided that ICA's appointment as Excel's agent of record could be canceled in writing by Excel at any time.

32. Jones testified there was no understanding between ICA and Excel as to the length of time ICA was to remain Excel's agent of record and he had no specific intentions concerning how long ICA was to remain Excel's agent of record.

33. Young likewise admitted there was no specific period of time that ICA was to serve as Excel's agent of record.

34. Jones, on behalf of Excel, had the authority to revoke the appointment of ICA as agent of record at any time in writing.

35. On March 28, 1996, Young delivered Excel's agent of record letter, dated March 21, 1996, to Robert Crutcher at Omaha, Nebraska. At that time, Crutcher was employed by Hartford as the manager of the Livestock Division and his office was located in Omaha, Nebraska.

36. Prior to the delivery of the agent of record letter by Young to Crutcher, Young had not contacted anyone at Hartford about the Excel account.

37. Upon receipt of ICA's agent of record letter on March 28, 1996, Hartford notified Keith Olson of Packers in writing that Hartford had received a new agent of record letter, effective April 1, 1996. Hartford then canceled the existing livestock insurance policies placed with Excel by Packers and issued new livestock policies to Excel, effective April 1, 1996, showing ICA as the agent.

38. On April 12, 1996, Young initiated a telephone conversation with Jones and when Jones returned the call to Young, Jones stated he wanted to talk with the "top guy" at Hartford to see if they would build a new insurance program. Jones asked for a telephone number and Young gave him Crutcher's number at Hartford in Omaha.

39. On April 17, 1996, Jones called Crutcher to inquire whether Excel had to work through an agent or whether Excel could work directly with Hartford [2].

---

**2.** Plaintiff apparently, though not clearly, contests this fact in its response; however, I find that based on the evidence presented, this is an uncontested fact. It is uncontested that on April 12, 1996, Jones told Young he wanted to talk to the "top guy" at Hartford and obtained from Young, Crutcher's telephone number (Paragraph 38). Although there is no deposition testimony from Jones in which he explicitly states that he initiated the call to Crutcher on April 17, he does state "I *went to* Mr. Crutcher and asked if we could work directly with the regional people at each plant. He said yes. That is the whole crux of the—" (Don Jones Deposition at 145). On April 17, 1996, Crutcher wrote to Jones, "It was a

40. Jones stated he wanted to know if Excel could work directly with the Hartford field offices located near the individual hog processing plants in an attempt to obtain better management.

41. In response to Jones' question to Crutcher as to whether Excel could work directly with the local Hartford offices, Jones testified Crutcher informed him Excel could do business directly with Hartford if Excel wanted to. During this conversation, Jones brought up the subject of expenses and Crutcher informed Jones that an agent's commission is a part of the expenses on the policy.

42. During a telephone conversation between Young and Jones on April 29, 1996, Jones told Young that he (Jones) has a problem with the entire insurance program.

43. In an undated letter addressed to Crutcher, which was sent via facsimile on April 30, 1996, Jones stated Excel did not "need a broker to handle [the Excel] accounts," but "would like to work with the Hartford Agent that is assigned to each plant ..."

44. After a telephone conversation between Jones and Crutcher, during which Jones confirmed he wanted to work directly with the local Hartford offices, Jones sent Crutcher, via facsimile dated May 1, 1996, another letter stating he wanted to "work with the Hartford local office that is assigned to each plant," and that until certain loss problems were resolved, "we do not need a broker to handle these accounts."

45. On May 2, 1996, Hartford sent notification to ICA that Hartford had received an agent of record letter from Excel requesting the policies on the three hog processing plants no longer be credited to ICA[3]. Although the request was effective May 1, 1996, Hartford held the letter for 10 days to give ICA the opportunity to retain the business.

46. Neither Young nor ICA took any action to retain the Excel account.

47. After Jones informed Hartford that he no longer needed a broker to handle Excel's accounts, Hartford canceled the Excel livestock insurance policies showing ICA as the agent of record, >with an effective date of April 1, 1996, and issued new livestock policies, with an effective date of May 1, 1996, to each of Excel's three hog processing plants, with Hartford's local field offices as the agent.

48. Hartford paid ICA for all commissions due on the livestock insurance premiums for the month of April 1996, which was the only month that ICA was Excel's agent.

## IV. CHOICE OF LAW

■ In a diversity case, a district court applies the choice of law rules of the state in which it sits. *Birnstill v. Home Sav. Of America*, 907 F.2d 795, 797 (8th Cir.1990). For contract and tort actions, Missouri courts apply the significant relationship tests found in the Restatement (Second) of Conflicts of Law. *Id.* The parties·do not specifically address the choice of law issues in their pleadings, but defendant clearly

pleasure to talk to you this morning. I appreciate your calling me. I hope that I was able to satisfactorily answer your questions." (Tab N, Defendant's Suggestion in Support). Plaintiff has offered no evidence that Crutcher or anyone else at Hartford initiated this call. Plaintiff points out that the April 17 conversation occurred "within one week of Hartford's internal memos in which Hartford expressed concern that Hartford might lose the business now that ICA is the designated agent." This information is apparently offered to suggest that Hartford had *reason* to contact Excel.

This suggestion is entirely speculative and insufficient to create a factual dispute.

3. In its suggestions in opposition, plaintiff states that Excel did not "specifically revoke the designation of ICA as Hartford's agent on the insurance." This is immaterial. Jones stated in his letters to Hartford that Excel did not need a broker to handle the accounts. Young understood from this that Excel would be working directly with Hartford. (Mike Young Deposition at 165).

has relied on Missouri law and plaintiff has not objected. I conclude that Missouri law is the correct law to apply to the claims in this case. Missouri is the place of performance and the location of the subject matter of the Agency Agreement as well as plaintiff's place of business. As for the tort claims, the alleged injury occurred in Missouri and Missouri is the location of plaintiff's business.

## V. BREACH OF CONTRACT— COUNTS ONE AND TWO

Plaintiff contends in its complaint that defendant has breached its Agency Agreement with plaintiff, including the duty of good faith and fair dealing implied in the agreement, by soliciting Excel's business and by refusing to pay commissions on the premiums for livestock insurance issued by defendant to Excel after April 1996.

In its motion for summary judgment, defendant argues that the undisputed facts demonstrate that plaintiff was Excel's agent of record only for the month of April 1996, that the policies carried by Excel after April 1996 were, at Excel's request, placed directly with Excel by Hartford, and that as a result plaintiff is entitled under the terms of the Agency Agreement to a commission only for April 1996, which commission has been paid to plaintiff.

Plaintiff's position is that there are genuine issues of material fact as to defendant's obligations under the Agency Agreement created by (1) industry custom and usage; and (2) the implied covenant of good faith and fair dealing.

### A. CUSTOM AND USAGE

Plaintiff contends that the Agency Agreement is "extraordinarily vague in setting forth the circumstances in which ICA is entitled to receive commissions on the insurance policies placed by ICA and extrinsic evidence is necessary to determine the intentions of the parties in entering into the contract." In its suggestions in opposition to defendant's motion for summary judgment, plaintiff has provided evidence in the form of the affidavit of Eugene Konzem, plaintiff's former Managing Partner, to the effect that under the American Agency System, when an insured purchases insurance from an agent, the insurance carrier is "precluded from then selling its insurance directly to the insured." (The Agency Agreement itself is silent on this precise point.) The American Agency System is described in the affidavit as "a set of customs and practices governing the relationship between independent insurance agencies/agents (such as ICA) and insurance carriers who sell their product through independent agencies/agents (such as Hartford)." It is apparently plaintiff's position that this "custom and practice" should be considered a part of the Agency Agreement and creates a genuine issue of material fact as to defendant's "rights, duties and liabilities" under the Agency Agreement.

■ The purposes for which evidence of custom and usage may be considered were explained in a decision of a Missouri appellate court: "The concept of custom and usage requires that the parties have entered into a contract which either has omitted a provision or has expressed the agreement uncertainly. Resolution of ambiguity or unintentional omission is then accomplished by determining the actual intent of the parties at the time through the assumption that a prevalent custom was inherent in the contract although not expressed." *Buxton v. Harsh,* 631 S.W.2d 95, 97–98 (Mo.Ct.App.1982). *See also Dial v. Lathrop R–II School Dist.,* 871 S.W.2d 444, 449 (Mo.1994) (banc). Evidence of custom and usage may not be used to change the meaning of unambiguous terms. *Jake C. Byers, Inc. v. J.B.C. Inv.,* 834 S.W.2d 806, 817 (Mo.Ct.App.1992).

■ In order for a practice to be considered a "custom," it must be "definite, fixed, reasonable, and exist for a long enough time to have been known by the parties." *Buxton v. Harsh,* 631 S.W.2d at 97. A custom must either be known by

the parties involved or so widespread and general that knowledge of it is imputed. *Id.*

I conclude that plaintiff's evidence of custom (1) fails to satisfy the requirements of Federal Rules of Civil Procedure, Rule 56(e); (2) even if considered, provides insufficient evidence by which a jury could find the practice described is, in fact, a "custom;" and (3) is not determinative of the outcome of this case in the light of relevant Missouri law.

### 1. RULE 56(e)

■ Rule 56(e) requires that affidavits supporting or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." In evaluating evidence related to possible summary judgment, a court may not consider affidavits that do not satisfy the requirements of Rule 56(e). *El Deeb v. University of Minn.*, 60 F.3d 423, 429 (8th Cir.1995)

■ I find Konzem's affidavit woefully uninformative as to precisely what the American Agency System is and how one becomes "familiar" with it, as Konzem states he is. I do not know if it is based upon a written manifesto, which Konzem has read and is thus able to report on, or is more of an informal understanding that one picks up willy-nilly over the course of a career in the insurance business. Without some idea on this and the basis upon which Konzem makes his affidavit, I am unable to ascertain that Konzem is competent to testify on its subject matter, notwithstanding his 30–plus years of experience in the industry. Because I am unable to ascertain than Konzem is competent to

testify as to the subject matter of the affidavit, the affidavit does not comply with Rule 56(e) and will not be considered [4].

### 2. EVIDENCE INSUFFICIENT TO ESTABLISH A "CUSTOM"

■ Even if I were to consider the affidavit, I do not find that it creates a genuine issue of material fact because it does not set out evidence from which a jury could reasonably find that the purported "practice" is in fact a "custom" under Missouri law.

First, the affidavit does not state, nor contain facts from which one could conclude, that the practice is "definite and fixed." The practice is described in at least three different ways in the affidavit:

> Under the American Agency System, when an insured purchases insurance through an agent, rather than directly from the insurance carrier, the insurance carrier is precluded from then *selling* its insurance directly to the insured (¶ 5) (emphasis added).

> Other independent agents can compete for the business of the insured and the insured may switch from one independent agent to another, but the insurance carrier *may not compete against its own independent agents* and sell the insurance directly to the insured (¶ 5) (emphasis added).

> The standard Agency Agreement between an independent agent and an insurance carrier does not directly address the question of whether the insurance carrier can *take the business away from the agent* and write the business direct, but the custom and practice in Missouri and other states operating under the American Agency System precludes the insurance carrier from doing so (¶ 6) (emphasis added).

---

**4.** Although this affidavit is clearly intended as expert testimony, at the time plaintiff filed its suggestions in opposition to defendant's motion for summary judgment, Konzem had not been designated nor qualified as an expert under Rule 26(a). I have not been informed that he has since been so designated. Defendant has suggested that the affidavit be stricken, but has offered no evidence that it has been *harmed* by plaintiff's failure. Fed.R.Civ. Proc. 37(c). I find it unnecessary to decide this issue.

In the first sentence there is an unequivocal prohibition against an insurance carrier *selling* directly once the insured has purchased through an agent. The second sentence prohibits *competition* between the agent and the carrier, but arguably leaves open the possibility the carrier might yet sell direct to a client who had previously purchased through an agent. The third sentence only prohibits *taking business away* from the agent, but arguably leaves open the possibility the carrier might either sell directly or compete for business. An argument can be made, although I will not make it here, that the situation in the case before me is not prohibited by either of the last two enunciations of the practice at issue. In short, the affidavit suggests that this practice is a rather amorphous concept, not definite and fixed.

Further, the affidavit neither states nor sets out evidence from which a jury could reasonably find that the practice has been in existence for a long enough time to be known by the parties. Although the implication of the affidavit is that the American Agency System has been in existence at least since 1967, that fact says nothing about how long the specific practice with which this affidavit is concerned might have been in existence.

Because the affidavit fails to set out evidence from which a jury could reasonably find that the practice in question is a "custom" (and should therefore be considered a part of the Agency Agreement), plaintiff has not established a genuine issue of material fact as to the terms of the contract.

### 3. MISSOURI LAW

Even if I were to conclude that plaintiff had established the existence of this custom, I would still find that the existence of the custom is not determinative in this case. My conclusion is based upon two Eighth Circuit cases interpreting Missouri law and a recent Missouri Court of Appeals case that have set down a ruling principle for resolving questions as to the relative rights of an insurer, its agents and the insured.

In *Fred Miller Co. v. Empire Fire & Marine Ins. Co.*, 503 F.2d 751 (1974) (interpreting Missouri law), the Eighth Circuit addressed the rights and liabilities of an insurance carrier and an agent upon termination of their agency agreement. Miller, the agent, sought to recover from Empire, the insurer, for alleged interference with Miller's use and control of "expirations" guaranteed him by the terms of his agency agreement. The court explained the meaning of the term "expirations" in the insurance field:

It embodies the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance.... It has been determined that this information is of vital assistance to the agency in carrying on the insurance business and it has become, in the insurance field, recognized as a valuable asset in the nature of good will.

*Id.* at 752 n. 1.

The insurance placed by Miller with Empire came to him through independent insurance agents. There were, then, four tiers involved in this dispute: the insured client, the independent agent, Miller, and Empire.

At some point, Empire terminated its agency agreement with Miller. After that time, Empire sent a series of mailings to Missouri insurance agents soliciting them to become agents for Empire. It is this action of Empire's that triggered Miller's lawsuit. Miller contended that this solicitation interfered with his right to use and control of expirations guaranteed him under his agency agreement. The agency agreement provided:

In the event of termination of the Agreement, the Agent having promptly

accounted for any paid over premiums for which he may be held liable, the Agent's records, use and control of expirations shall remain the property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in the Company.

Empire contended that the expirations belonged not to Miller but to the independent agents who referred the business to Miller and that Empire could therefore directly solicit these agents. The court concluded that, although the independent agents' rights to the expirations were superior to Miller's, Miller's agency agreement with the company guaranteed Miller's use and control of the records free from interference by the company. Notwithstanding that conclusion, the court stated that the independent agents could, nevertheless, bypass Miller and go directly to the insurance company and request appointment as an agent "without creating liability on the part of the insurance company or himself for an interference with protected rights of the general agent." *Id.* at 756.

In arriving at its conclusion in this case, the court discussed the relative rights of the parties at each level of the four-tier system:

> Paramount of course are the rights of the insured. No matter who, *as a matter of custom or contract,* may be considered to own the expirations to a given policy, it is always open to the insured to place his business with whomever he pleases. Thus, even though a subagent or local agent may be considered owner of the expiration, the insured may bypass the subagent or local agent and go directly to the general agent or the company and assert his unwillingness to purchase through the subagent. A renewal of the policy in these circum-

stances will not be considered an interference with expirations. But this is no support for the converse of that proposition, that a general agent or the company may bypass the subagent or local agent and go directly to the insured on their own initiative.

*Id.* at 754 (citations omitted) (emphasis added)[5]. This case was remanded to the district court to determine whether the insurance company had directly solicited the independent agents.

In *Davidson & Schaaff, Inc. v. Liberty Nat'l Fire Ins. Co.,* 69 F.3d 868 (8th Cir. 1995) (interpreting Missouri law), the court extended the reasoning of *Miller* to the rights of an agent to commissions. Davidson & Schaaff (D & S) had placed insurance for Supermarket Insurance Agency (Supermarket) with the insurance carrier, Liberty National. Liberty National subsequently terminated D & S as a broker and, when approached by Supermarket, renewed the policies directly with Supermarket, leaving D & S without a commission for the renewals. The court relied on the rationale of *Miller,* and held that because "unrebutted evidence showed that Supermarket approached Liberty National, and *because the interests of the insured are paramount to the ownership interest of the agent,* the [agency agreement] was not breached" by Liberty National. *Id.* at 870 (emphasis added).

The Missouri Court of Appeals, on facts remarkably similar to those before me, has again upheld the principle that the rights of the agent are not protected from the acts of the insured. *Charles Maggard Agency, Inc. v. Missouri Pub. Entity Risk Mgmt. Fund,* 974 S.W.2d 671 (Mo.Ct.App. 1998).

Charles Maggard Agency, Inc. (Maggard) and Missouri Public Entity Risk

---

**5.** The American Association of Managing General Agents had, in fact, filed a brief amicus curiae with the court arguing that the "customs embodied in the American Agency System" established the expirations as Miller's exclusive property in relation to the company and afforded him protection against interference by the insurance company. *Id.* at 755.

Management Fund (MOPERM) entered into an agency agreement for Maggard to transmit proposals for coverage by MOPERM. In 1989, Maggard obtained from MOPERM coverage for his client, the City of Sedalia, which the City renewed through Maggard each year until 1996. Before renewing its policy in 1996, the City contacted MOPERM and inquired about obtaining coverage directly through MOPERM without Maggard as an agent. MOPERM informed the City that it could do so, and further, that if it did so, the City's insurance premiums would be reduced by the amount of the agent's commission. The City then sent a letter to MOPERM saying it wanted to work directly with MOPERM. The City then bought its coverage directly from MOPERM, thus bypassing the agent, who received no further commissions. Maggard sued, alleging breach of contract.

■ The court reviewed the holdings in *Miller* and in *Davidson,* and held that where "the insured independently decides to deal directly with the insurer and purposely bypasses the agent, the agent has no cause of action against the insurer, unless, of course, the contract specifically provides therefore." *Maggard,* 974 S.W.2d at 675. The court stated further that the "insured has an unqualified right under Missouri law to end its relationship with the agent and to act through a new agent or directly with the insurer." *Id.* at 676.

■ Plaintiff argues that the *Maggard* decision is inapplicable to the facts before me because the court in *Maggard* (1) was not forced to consider the provisions of an ambiguous contract; and (2) was considering the rights of an agent to commissions on the renewal of policies and was not required to consider the acts of the insurer in canceling policies placed by the agent one month after the policies were placed and then rewriting identical policies directly with the insured.

Although plaintiff states that the Agency Agreement is ambiguous, it does not direct me to any specific provision that it finds ambiguous. Whether or not a contract is ambiguous is a question of law. *CIT Group/Sales Financing, Inc. v. Lark,* 906 S.W.2d 865, 868 (Mo.Ct.App.1995). I do not find the Agency Agreement is ambiguous with respect to any provision material to this case. Although the Agency Agreement does not expressly deal with the rights of the parties in the event the insured seeks to terminate its relationship with the agent and deal directly with the insurer, that silence does not create an ambiguity in the Agency Agreement. What is entirely clear is that the Agency Agreement does not specifically provide that the agent will have a cause of action against the insurer if the insured decides to deal directly with the insurer and bypass the agent; therefore the agent does not have such a cause of action.

As to plaintiff's second point, the *Maggard* decision does not limit its holding to those situations in which the insured's decision to deal directly with the insurer coincides with the end of the insurance term. In the case before me, the insured, Excel, apparently regretted its decision to deal through plaintiff as soon as the decision had been made. When it contacted Hartford with the request to deal direct with the insurer, Hartford was under no obligation to tell Excel to come back in eleven months.

Plaintiff may argue that even if the *Maggard* decision precludes any obligation of defendant to pay commissions on renewals of Excel's policies, still it is due commissions for the months of the unexpired term. The Agency Agreement unambiguously provides otherwise. Section I of the Agency Agreement provides that the "Company reserves the right to cancel at any time any policy placed by the Agent with the Company." Section II provides further that the "Agent agrees to return promptly to the Company commissions retained by him or paid by the Company on

premiums refunded under any policy by reason of cancellation or otherwise." It is clear that once the insurer has exercised its legal right to cancel a policy, the agent has no right to commissions.

The *Miller, Davidson,* and *Maggard* decisions all agree that their holdings are inapplicable in situations when the insurer solicits the business at issue. *Miller,* 503 F.2d at 756; *Davidson,* 69 F.3d at 870; *Maggard,* 974 S.W.2d at 675. Plaintiff argues that defendant did, in fact, solicit Excel's business, but has failed to submit sufficient evidence to create a genuine dispute on that point. The only evidence to which plaintiff has directed my attention is in connection with discussions and contacts defendant had with Excel *after* Excel had initiated contact with defendant and requested information about working with defendant rather than through an agent. This alone is insufficient to raise a genuine dispute on the issue of solicitation. Excel's right to deal directly with the insurer would be meaningless if the insurer were not free to provide complete information and discuss candidly with the insured the ramifications of any decision of the insured's to deal direct. Plaintiff has offered no evidence that defendant did anything more than this.

■ I conclude that even if there does exist an industry custom ostensibly prohibiting an insurance carrier from selling insurance directly to an insured who has previously purchased through an agent, that custom cannot, under Missouri law, defeat the right of the insured to deal directly with the insurance carrier. Therefore, any factual dispute as to the existence of this industry custom is immaterial.

## B. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiff also contends that the implied covenant of good faith and fair dealing creates a duty on defendant's part to refrain from attempting to appropriate the business of its agent:

Hartford cannot cancel existing insurance policies produced by an independent agent solely in order to write the insurance directly and thus eliminate the agent's commission. It does not matter whether the idea to cut out the agent came from the insurer or the insured, ICA was the producer of the insurance policies and is entitled to its commissions until replaced by another independent agent or the insured no longer obtains the insurance. To hold otherwise would allow insurers to continually undercut their independent agents and deny them their commissions by simply dealing directly with the insureds after the agents had obtained their business. Such practices render the insurer's promise of paying commissions illusory and constitute a breach of the implied covenant of good faith and fair dealing implied in all contracts.

■ It is true that a covenant of good faith and fair dealing is implied in every Missouri contract. *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 368 (Mo.Ct.App. 1996). This duty "prevents one party to a contract to exercise a judgment conferred by the express terms of the agreement in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Acetylene Gas Co. v. Oliver,* 939 S.W.2d 404, 410 (Mo.Ct.App.1996).

Having said that, I believe that under the holding in *Maggard,* the implied covenant of good faith and fair dealing is not implicated in the transaction before me. Under *Maggard,* unless an agency agreement specifically provides otherwise, an agent has no cause of action against the insurer when the insured independently decides to deal directly with the insurer and purposely bypasses the agent. *Maggard,* 974 S.W.2d at 675. I have already concluded that there is no provision in the Agency Agreement that specifically provides a cause of action against the insurer under these circumstances.

Plaintiff has not established a genuine issue of material fact as to the terms of the Agency Agreement or defendant's performance under it. Because, under Missouri law, plaintiff has no cause of action for breach of contract against defendant, defendant is entitled to summary judgment on these claims.

## VI. QUANTUM MERUIT

Plaintiff seeks to recover under the theory of quantum meruit for approximately 750 hours expended during the period December 1994 to March 1996 for "consulting services in order to secure and retain the business of Excel in the placement of livestock insurance."

█ To recover under the theory of quantum meruit, plaintiff must establish (1) that it provided to defendant services at the request or with the acquiescence of defendant; (2) that those services had a certain reasonable value; and (3) that defendant, despite demands of plaintiff, has refused to pay the reasonable value of the services. *Berra v. Papin Builders, Inc.*, 706 S.W.2d 70, 73 (Mo.Ct.App.1986).

It is clear that the consulting services were neither provided *to* defendant nor provided at the request or with the acquiescence of defendant. It is uncontroverted that Excel had its insurance with defendant at the time Mike Young began providing the consultation services and that Young, in fact, spent most of the consultation period trying to get Excel to obtain its insurance from Firemen's Fund rather than from Hartford. Young has stated in his deposition:

Q. And when you say you spent 16 to 18 months working on the program, you are not saying that you spent that time working on Hartford's behalf?

A. No. I was working on Excel's behalf.

Q. Because for the bulk of that time, up until late February of '96, you were suggesting and pursuing with Excel a switch to a Firemen's Fund policy?

A. At his request, yes.

Q. Right. But it was—you were not working during that time on behalf of the Hartford?

A. No.

Q. And, in fact, it would be directly contrary to their interest if that business moved from Hartford to Excel, would it not?

A. From Hartford to Excel?

Q. I am sorry. If that account moved from Hartford to Firemen's Fund, that would be contrary to Hartford's interest?

A. Yes.

(Young Dep. at 136)

In fact, it was only after Excel had resisted Young's efforts to woo it away from Hartford, and after Excel had designated plaintiff as its agent of record with respect to its coverage with Hartford, that plaintiff informed defendant that it was working on the Excel account (Young Dep. at 21–22).

Because the uncontroverted facts demonstrate that the consulting services were not provided on defendant's behalf and were performed neither at defendant's request nor with defendant's acquiescence, plaintiff cannot recover under quantum meruit for its consulting services.

## VII. TORTIOUS INTERFERENCE

Plaintiff alleges that defendant intentionally interfered in plaintiff's relationship with Excel by "inducing Excel to deal directly with Hartford and in terminating the policies produced by ICA to defeat ICA's entitlement to commissions on the policies." Plaintiff states further that these actions "may constitute an independent tort giving rise to liability for tortious interference."

█ Tortious interference with a contract or business expectancy requires proof of (1) a contract or valid business

expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo.1993) (en banc). Plaintiff has the burden of establishing lack of justification. *Id.* at 316–17.

> If the defendant has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests. In the context of this tort, improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law. Conversely, no liability arises if the defendant had an unqualified legal right to do the act complained of.

*Id.* at 317.

Plaintiff has failed to establish that defendant's actions constitute wrongful acts either under statute or the common law. We have already concluded that defendant had a legal right, when approached by Excel, to cancel the policies placed by plaintiff and to deal directly with Excel. Therefore, plaintiff's tortious interference claim must fail.

### VIII. CIVIL CONSPIRACY

Plaintiff alleges that defendant's actions "in inducing Excel to deal directly with Hartford and in terminating the policies produced by ICA to defeat ICA's entitlement to commissions on the policies constitutes wrongful conduct and that defendant's dealings with Excel in this connection amount to civil conspiracy."

To establish a claim of civil conspiracy, plaintiff must show (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) plaintiff was thereby damaged. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo.1996) (en banc). I have already found that defendant's actions were not a breach of its contract with plaintiff. Plaintiff has failed to establish its claim of tortious interference. As plaintiff has pled no other basis upon which the court might find an unlawful objective, plaintiff's claim for civil conspiracy must fail.

### IX. EXEMPLARY DAMAGES

Because defendant has established that summary judgment is appropriate under each count of the complaint, summary judgment must also be granted with respect to plaintiff's claim for exemplary damages.

### X. CONCLUSION

Based on the above findings of undisputed facts and the law as discussed in sections V. through IX., I find that there is no genuine issue of material fact and that defendant is entitled to summary judgment on all of plaintiff's claims. Therefore, it is

ORDERED that defendant's motion for summary judgment is granted.