Shawn SPILMAN, Plaintiff,

v.

MOSBY–YEARBOOK, INC., Defendant.

No. Civ.A.98–10934–PBS.

United States District Court,
D. Massachusetts.

Sept. 26, 2000.

Ronald M. Davids, Thomas J. Schlesinger, Davids & Schlesinger, L.L.P., Wellesley, MA, for Shawn Spilman, plaintiff.

Edward P. Leibensperger, Nutter, McClennen & Fish, Boston, MA, for Mosby–Yearbook, Inc., defendant.

Robert B. Collings, United States District Court, Boston, MA, ADR Provider pro se.

## MEMORANDUM AND ORDER

SARIS, District Judge.

Plaintiff, Shawn Spilman, d/b/a Eliot Press, sold the publication rights to his health care manuals to the defendant, Mosby–Yearbook, Inc. ("Mosby"), which agreed to use its best efforts to protect the copyrights and to use commercially reasonable efforts to promote the publications. Alleging that Mosby failed to com-

ply with these obligations, plaintiff filed this diversity action asserting breach of contract (Count 1) and unfair and deceptive trade practices under Mass.Gen.L. ch. 93A (Count 2). Mosby has filed counterclaims for breach of contract and unfair practices, alleging that Spilman broke his end of the deal when he sold manuals after July 11, 1994.

Defendant moves for summary judgment on the grounds that: (1) Spilman materially breached the agreement by failing to transfer valid copyrights to the manuals; (2) Mosby had total discretion under the contract as to whether to publish and promote the works; and (3) Spilman is estopped from bringing the claim because he misrepresented the validity of his copyrights during the parties' negotiations.

For the reasons herein, defendant's motion is *DENIED.*

### *FACTS*

Drawing all reasonable inferences in favor of the nonmoving party, the Court treats the following facts as undisputed except where noted.

### A. *Background*

The Resident Assessment Instrument is a government mandated system for evaluating the functional capacity of chronically ill patients. It is typically used in nursing homes and other long-term health care facilities. The system has three components: the minimum data set ("MDS"); the utilization guidelines; and the Resident Assessment Protocols ("RAPS"). As a matter of convention, this entire system is called MDS.

The Original MDS was developed under the auspices of the Health Care Financing Administration ("HCFA"), a federal agency, in response to a Congressional mandate that all nursing homes participating in Medicare and Medicaid programs comply with specific resident assessment requirements.[1] The original MDS was cre-

ated by a team of experts from the public and private sectors under the supervision of John Morris of the Hebrew Rehabilitation Center for the Aged. They were subcontractors for the Research Triangle Institute. In September 1990, the HCFA made the project available to the public by publishing it in the State Operations Manual and the State Medicaid Manual. The system was mandatory although states were allowed to supplement it with additional requirements.

### B. *The Red Book*

In January 1991, Morris gave Spilman a copy of the Original MDS on a computer disk. Indeed, the authors distributed it to anyone who asked for it. Spilman agreed to create and publish a commercial book which would explicitly name the authors. Spilman also agreed to provide copies of his publication to the original authors at no charge. In return, Spilman claims Morris orally agreed that Spilman would own the copyright with the understanding that the Original MDS manuscript would remain in the public domain. Morris remembers the transaction differently. Morris's memory is that Spilman was looking to copyright only the form and the look of the document.

Spilman used the electronic copy to develop the Resident Assessment Instrument Training Manual and Resource Guide (the "Red Book"). Although its text was substantively the same as the Original MDS (which Spilman concedes is in the public domain), it also included several enhancements. The most labor-intensive enhancement was that Spilman altered the source codes in the computer disk he received from Morris to a format that allows mass publication. His other contributions include: editing the original MDS for style, grammar, and punctuation; creating a table of contents; adding the term "Minimum Data Set" and "MDS" to the title on the cover; creating the cover design and

---

1. This mandate was part of the Omnibus Budget Reconciliation Act of 1987. The specific requirements are also outlined in 42 C.F.R. § 483.20.

logo; adding a two-color scheme to the text, changing the "line art"; and adding the names of the Original MDS authors to the title page. Spilman published the book himself under the name Eliot Press. He also registered it with the U.S. Copyright Office. The resulting Red Book went to press in mid–1991. Tens of thousands were sold.

### C. *MDS Plus*

After releasing the Original MDS, the HCFA undertook a separate parallel project with the different goal of evaluating the system's efficacy in dealing with the mixed-payment Medicare and Medicaid patients. The study was headed by Elizabeth Cornelius of the HCFA and included several private consultants. Morris was not involved in its development. Based on the study, the HCFA developed MDS Plus. Fifteen to twenty states adopted the MDS Plus system as their official in-state system. It had to contain everything in the Original MDS plus the requirements of the state system. MDS Plus was never codified in the Federal Register.

Over the next three years, using the Red Book as his starting point, Spilman produced a special book for use in Colorado and a series of three MDS Plus books for use in various other states. Spilman obtained information about MDS Plus from Cornelius and the consultants who worked on the project, and used the information to develop the MDS Plus Reference Manual. Spilman asserts that he obtained the rights in HCFA's work in a verbal agreement with Cornelius. The MDS manual contains numerous format changes. Spilman claims that he primarily authored significant textual additions to the Red Book (words, sentences and paragraphs). Mosby disputes this claim. He also included specific material at the request of HCFA or a state.

In 1992 and 1993, Spilman registered five publications relating to the Red Book and the MDS Plus (four publications) with the U.S. Copyright Office. He licensed excerpts of MDS or MDS Plus to computer software and medical forms vendors, including Briggs Corp. and Med–Pass, Inc., the two largest vendors of MDS products. Their licensed products carried the copyright of Eliot Press. He also gave licenses to various translators.

### D. *MDSv.2*

Finally, in the mid–1990's, HCFA contracted with Morris of the Hebrew Rehabilitation Center, and others, to update the Original MDS. In 1996, the HCFA published MDS Version 2.0 ("MDSv.2"). It published that version in the Federal Register effective as of January 1, 1996, making it applicable to all states. According to Spilman, it contains substantial portions of MDS Plus books authored by Spilman. It rendered the Original MDS largely obsolete. Spilman developed a manuscript entitled the MDS Version 2.0 Reference Manual, which was based on the HCFA's public domain work. MDS Version 2.0 was made available on HCFA's website. All the authors of the Original MDS and MDSv.2 assigned their rights to interRAI, a non-profit group.

### E. *The Agreement*

In early 1994, Spilman entered into negotiations with Mosby for the sale of the publications. As part of Mosby's due diligence for the purchase, it developed a business plan for Eliot Press. The plan was used to garner the approval of Mosby's parent company, the Times–Mirror Corp. One of Mosby's primary concerns during the negotiations was whether Spilman actually owned the rights to the publications. The business plan addresses that concern, stating that although the Original MDS was in the public domain, Spilman was able to copyright "significant portions" of the MDS and MDS Plus product. (Pl. Ex. D at 4). It said: "[Eliot Press] has done this through subsequent revisions which have certain embellishments, illustrative examples, and changes that are copyrightable. This amounts to about 40% of the MDS product, 100% of the alternate material in MDS and state-specific product

and 100% of the altered trigger codes." (*Id.*). The Eliot Press Business Plan hung its copyrightability on the text clarifications and original clarifying examples.

On July 11, 1994, Mosby purchased the rights to ten MDS publications from Spilman. As part of the agreement, Spilman represented that he was "the owner by virtue of authorship (text, compilation and editing) of the copyrights for those portions of the Publications that are not in the public domain," and that to the best of his knowledge "there are no copyrightable or other proprietary contributions of third parties embodied in the publications." (Agreement ¶ 5.8).

The purchase price for these rights was $400,000, plus an additional royalty of 20% of the net revenues from sales of the publications until Spilman had received $2,000,000, and then 10% of net revenues thereafter. In connection with paying royalties, Mosby agreed:

> (b) Buyer shall have the sole responsibility and discretion in establishing the pricing structure for the Publications and any derivative works thereof. Buyer agrees to reasonably consult with Seller with respect to significant changes in the pricing structure, subject to his availability for such consultation. The final decision as to all pricing, advertising, promotion, distribution, sale and licensing or other disposition of the Publications, and any derivative works thereof, shall rest with Buyer.
>
> (c) Buyer agrees that it will (i) use commercially reasonable efforts to promote, market, and sell the Publications, and any derivative works thereof, and license rights related to the Publications, as it deems appropriate, and (ii) use its best efforts to protect the rights granted by Seller to Buyer hereunder. Buyer and Seller agree that in the event Buyer undertakes legal action with respect to infringement of Buyer's rights hereunder, the net proceeds of any recovery after Buyer's expenses are fully deducted and paid shall be considered net receipts for purposes of Section 9.2 below.

The agreement also states that it shall be governed by Missouri state law.

In November 1994, Mosby sent a letter to HCFA to explore how it could grant HCFA unlimited rights to utilize the "Plus" portion of the instrument and submitted a draft memorandum of understanding. These negotiations were unsuccessful.

## DISCUSSION

### A. Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing the record, the Court must consider all evidence in light most favorable to the non-moving party. *See id.* at 255, 106 S.Ct. 2505.

### B. Protecting Copyrights

#### 1. The Validity of Spilman's Copyrights

Spilman alleges that Mosby violated the best efforts provision of the contract when it did not attempt to prevent HCFA and two commercial vendors from violating the copyrights. He also contends that Mosby failed to protect his rights in trade dress and the right to use the Eliot Press name. Mosby responds that it was not obligated to protect Spilman's copyrights because Spilman materially breached the agreement by failing to transfer valid copyrights. Mosby asserts that the copyrights are invalid for two reasons. First, it claims that Spilman acquired the rights to these works pursuant to *verbal* contracts in violation of 17 U.S.C. § 204(a). Second,

Mosby claims that his publications are either public domain documents or derivative works not entitled to protection under 17 U.S.C. § 101.

#### a. *Transfer*

■ Mosby's first argument is that the copyrights are invalid because Spilman did not acquire rights to the work pursuant to a *written* instrument signed by the authors. The copyright statute of fraud provides:

A transfer of copyright ownership, other than by law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is *in writing* and signed by the owner of the rights conveyed or such owner's duly authorized agent.

17 U.S.C. § 204(a). The chief purpose of Section 204(a) is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership. *See Imperial Residential Design, Inc. v. The Palms Dev. Group, Inc.,* 70 F.3d 96, 99 (11th Cir.1995).

Spilman argues that the alleged verbal transfers are valid pursuant to 17 U.S.C. § 201(d)(1), which states, in part: "[T]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law...." This clause states the "principle of unlimited alienability of copyright." H.R.Rep. No. 94–1476. Its purpose is to affirm the basic principle that copyright can be "transferred inter vivos or upon death from the author or initial copyright owner and transferred again." Robert A. Gorman, *Copyright Law* 52 (Federal Judicial Center 1991). Section 201(d) does not trump Section 204(a) but must be read in tandem with it. *See* 3 Melville B. Nimmer & David B. Nimmer, *Nimmer on Copyright* § 10.03[A][1] (2000) (describing writing requirement for any transfer other than one by operation of law). Therefore, to the extent Spilman alleges he had valid copyrights for the entirety of these works as a result of an oral agreement with the project officers, John Morris and Elizabeth Cornelius, his argument fails.

#### b. *Copyright Validity*

Even though Spilman could not acquire valid copyrights by an oral conveyance, he argues that his publications are still eligible for protection as derivative works. *See* 17 U.S.C. § 101 (defining a "derivative work" as a work "consisting of editorial revisions, annotations, elaborations, or other modifications," which, as a whole, represent an original work of authorship to a pre-existing work). The copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work...." 17 U.S.C. § 103(6).

■ As a threshold matter, both parties agree that public domain documents cannot be copyrighted. *See Building Officials & Code Adm. v. Code Tech, Inc.,* 628 F.2d 730, 734 (1st Cir.1980). Because the Original MDS was placed in the public domain, Spilman concedes he has no valid claim of copyright to most of its text. However, he points out additions which he claims are protected in his "Red Book" and the MDS Plus series.

■ To qualify as derivative works, Spilman must have made original contributions that in some way distinguish his publications from the underlying work. *See M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 438 (4th Cir.1986) (requiring the new material demonstrate a "faint trace of originality" and "a distinguishable variation" from the prior work) (citations and quotations omitted); 1 *Nimmer on Copyright* § 3.03[A], at 3–12 ("Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in a meaningful manner will be sufficient."). Only the original portions of a derivative work can be copyrighted. *See Stewart v. Abend,* 495 U.S. 207, 233, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (stating that an author may copyright a

novel that contains story elements found in the public domain but only his original contributions are entitled to protection); *Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 782 (2d Cir.1994) ("In the case of a derivative work based on an underlying work in the public domain, only the material added to the underlying works is protected by copyright.").

■ The term original means that a writing must have been "independently created by the author ... [and] possess at least some minimal level of creativity." *Feist,* 499 U.S. at 345, 111 S.Ct. 1282. However, "the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.; see also Key Publications, Inc. v. Chinatown Today Publ'g Enters., Inc.,* 945 F.2d 509, 512–13 (2d Cir.1991) ("Simply stated, original means not copied, and exhibiting a minimal amount of creativity."). While a finding of originality is generally a question a of fact for the jury, under these circumstances it may be treated as a matter of law. *See CMM Cable Rep Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1517 (1st Cir.1996) (holding that, where there is insufficient evidence to permit a reasonable factual finding of originality, the question may be disposed of as an issue of law at summary judgment).

■ Spilman has registered his Red Book as well as four of his MDS Plus manuals with the Copyright Office. Those registration certificates constitute "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). They create a rebuttable presumption that the copyright is valid and shift the burden to Mosby to prove that Spilman does not own a valid copyright in the publications. *See Baystate Techs. v. Bentley Systems, Inc.,* 946 F.Supp. 1079, 1086 (D.Mass.1996). However, a "[k]nowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitutes a reason for holding the regis-

tration invalid." *Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 456 (2d Cir.1989).

Mosby implores the Court to disregard the registration certificates, claiming that Spilman misrepresented the nature of his work to the Copyright Office. Specifically, Mosby quarrels with Spilman's statements that the publications were based on "preexisting material from other sources" and that he added "text, compilation, and editorial revisions" to those sources. (Def.Exh.G). Mosby argues that Spilman's work was based on a single public domain source, the HCFA projects, and that his enhancements were limited to adding graphics and correcting spelling and grammar errors.

The Court addresses each publication separately.

### 1. *The Red Book*

Spilman claims that The Red Book produced in 1990 contains the original MDS text as well as significant additions and enhancements like the coloration of the text, line art and an original cover and spine. He also claims that he authored the practice exercises at pages 7–34 to 7–66 and page F– 1 (the Table of Contents).

■ Most of these enhancements are too trivial to be afforded copyright protection.[2] Enhancements such as the coloration of the text (adding red print) are not copyrightable. *See* 37 C.F.R. § 202.1(a); U.S. Copyright Office, *Compendium II: Compendium of Copyright Office Practices* § 503.02(a) (1984) ("[M]ere coloration cannot support a copyright even though it may enhance the aesthetic appeal or commercial value of a work."). While the term "line art" is unclear, "mere variations of typographic ornamentation" are not subject to copyright protection. 37 C.F.R. § 202.1(a). The table of contents does not have sufficient creativity to be protected

---

**2.** Neither side has briefed the claim of trade dress (i.e., coloration) with respect to the Red Book and the MDS Version 2 users Manual produced by Briggs Corp. six years later. Therefore, this claim is not addressed here.

either. *See Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 674, 683–89 (2d Cir.1998) (holding that enhancements such shortening the form of titles, capitalizing letters, providing subsequent case history and other garden-variety additions are not copyrightable because they miss the creative spark).

■ Spilman also claims copyright protection for the practice exercise (at pages 7–34 to 7–66). However, Mosby claims that the practice exercise is not protectible because it is identical in form to the practice exercise at pages 7–16 and 7–33 which Spilman does not claim he authored. If Spilman indeed authored the practice exercise, it has enough of a creative twinkle to be copyrightable. However, this claim to authorship is a sudden about-face. As Mosby points out, Spilman did not testify that he had authored this exercise in his deposition or in his first affidavit. (*See* Dep.Tr. 143–147; Spilman Aff. at ¶ 6). At his deposition he stated he only filled in a blank form by hand and provided a handwritten signature on pre-existing "interdisciplinary progress notes." It is bedrock law in this Circuit that a party cannot vary his deposition testimony with an affidavit unless there is an explanation for the variance. *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

Because Spilman's second affidavit claiming authorship does not explain why his earlier testimony was inaccurate, the claim of copyright protection for the entire practice exercise fails. Moreover, this discrepancy raises a concern about a misrepresentation to the Copyright Office with respect to his assertion that he added "text" and "compilation" to the Original MDS. At best, Spilman gets copyright protection for the blank form he filled in, and

he has presented no evidence that anyone infringed his copyright by using that form.

Spilman claims that the interlocking design on the cover and the MDS logo are original. Mosby does not contest that the design of the cover and spine with the interlocking ovals is entitled to copyright protection. However, there is no evidence that any person actually infringed the copyright.

### 2. *MDS Plus Books and Forms*

Between 1991 and 1994, Spilman produced a special book for use in Colorado and a series of three "MDS Plus" books for use in various other states. Spilman claims, with some fudging, that he authored textual additions and revisions to the Red Book as highlighted in yellow in Exhibit A to his affidavit. These additions include detailed instructions for completing the MDS Plus forms.

Mosby replies that most of the additions are either meaningless (as in the case of adding "a.b.c." in front of items not authored by Spilman) or can be expressed in so few ways as to render them uncopyrightable. It also contends that the "Plus" materials added by Spilman are largely mandated by the state and federal governments and therefore are not original.

■ The copyright laws do not protect stylistic and grammatical editing that does not distinguish Spilman's publications from the underlying work. *See Grove Press, Inc. v. Collectors Publication, Inc.*, 264 F.Supp. 603, 605 (C.D.Cal.1967). Moreover, under the "blank form" doctrine, a form that conveys no information and only provides a blank space for recording information does not warrant copyright protection. *See* 37 C.F.R. § 202.1(c) (excluding report forms from copyright protection); *Skinder–Strauss Assocs. v. Massachusetts Continuing Legal Educ., Inc.*, 914 F.Supp. 665, 674 (D.Mass.1995) (citing *Baker v. Selden*, 101

U.S. 99, 107, 25 L.Ed. 841 (1879)). Additions of things that can only be expressed in a limited number of ways, such as numbering or lettering items in a list or inclusion of a table of contents, are similarly not protected. *See* 37 C.F.R. § 202.1(a); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1st Cir. 1988) ("When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression.").

■ However, while the grammatical corrections and stylistic tweaking are not copyrightable, Mosby's remaining arguments with respect to the claim of authorship to original text are conclusory and not supported by specific examples or by affidavit. Spilman's testimony that he authored original text in the MDS Plus publications is sufficient to create a genuine issue of material fact with respect to copyrightability.

## C. *Best Efforts*

Spilman contends that Mosby failed to use its best efforts to protect his copyrights when it permitted HCFA to use MDS Plus text verbatim in its MDSv.2 Reference Manual and Forms. Spilman also contends that Mosby permitted infringement by forms and software vendors.[3] Mosby denies that HCFA violated the copyrights when it published MDSv.2. It points to a letter from Spilman's lawyer, Deborah Benson, who stated the MDSv.2 did not derive from MDS Plus but from the Original MDS and public domain source material, and to testimony from Morris who said that the only elements he put into MDSv.2 were ones he could trace back to the Original MDS.

■ The publication of copyrighted material by the federal government does not affect the copyright protections of private works. The fact that HCFA published copyrightable work of Spilman in the Federal Register does not eviscerate his copyright protection. *See Building Officials,* 628 F.2d at 735. Indeed, Mosby could have pursued an action against HCFA for copyright infringement in the Court of Federal Claims. *See* 28 U.S.C. § 1498(b). The federal government has no privilege to use copyrighted materials without the owner's consent. *See Time, Inc. v. Bernard Geis Assoc.,* 293 F.Supp. 130, 134 (S.D.N.Y.1968).

■ When the evidence is viewed in the light most favorable to Spilman, there is a genuine issue of material fact as to whether his MDS Plus publications contain *some* original material that distinguishes them from the HCFA projects and whether Mosby used its best efforts to protect them.

## D. *Commercially Reasonable*

Spilman claims that Mosby failed to use commercially reasonable efforts to promote and license his works. This claim is supported by Morris's deposition testimony that Mosby refused to grant him a license when Morris requested permission to use some of Spilman's text from MDS Plus. Spilman also claims that Mosby breached the Agreement by failing to market several of his publications, specifically the Revised Red Book, the MDS Pocket RAP Guide, and the MDSv.2 Users Manual. Mosby contends that it has the discretion under the contract not to market any of the Publications.

This dispute was created by the seemingly conflicting language in paragraph 9.1 of the Agreement. Subparagraph (b) states, "The final decision as to all pricing,

---

**3.** Mosby argues that the plaintiff's forms (published by Med–Pass) differ from the original MDS form contained in the Red Book (page 1–4) in only trivial ways. Spilman did not highlight for the court anything original about his form (as compared to the one in the public domain). Essentially, Mosby contends that Spilman simply stretched a five page form over forty pages, reordered some of the sections, and provided different coloring and shading. Because, generally speaking, Spilman's blank forms are not subject to copyright protection, Spilman's forms are not copyrightable unless he can prove there is authorship of original text. Coloring, shading, numbering, etc. is not enough.

advertising, promotion, distribution, sale and licensing or other disposition of the Publications, and any derivative works thereof, shall rest with Buyer." However, subparagraph (c) states, "Buyer agrees that it will (i) use commercially reasonable efforts to promote, market and sell the Publications, and any derivative works thereof, and license rights related to the efforts to the Publications, *as it deems appropriate....* " (Emphasis added).

■■■ Under Missouri law, contract construction is a question of law. *See Wood v. Wood,* 2 S.W.3d 134, 138 (Mo.Ct. App.1999). The court must construe a contract in a manner that is consistent with the parties' intentions, as understood by viewing the agreement as a whole. *See Ringstreet Northcrest, Inc. v. Bisanz,* 890 S.W.2d 713, 718 (Mo.Ct.App.1995). Also, "each term [must be] construed to avoid an effect which renders other terms meaningless." *Id.; see also Transit Cas. Co. v. Certain Underwriters at Lloyd's of London,* 963 S.W.2d 392, 397 (Mo.Ct.App.1998) (stating that the preferred construction gives "reasonable meaning to each phrase and clause" and does not "leave[ ] some of the provisions without function or sense."); *Jones v. Cox,* 629 S.W.2d 511, 513 (Mo.Ct. App.1981) ("[P]eople are presumed not to intend nullities.").

■■■ Missouri law recognizes the covenant of good faith and fair dealing implied in every contract. *Insurance and Consulting Assoc., LLC v. ITT Hartford Ins. Grp.,* 48 F.Supp.2d 1181, 1193 (W.D.Mo.1999) (citing *Slone v. Purina Mills,* 927 S.W.2d 358, 368 (Mo.Ct.App. 1996)). "This duty prevents one party to a contract to exercise a judgment conferred by the express terms of the agreement in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Acetylene Gas Co. v. Oliver,* 939 S.W.2d 404, 410 (Mo.Ct.App.1996). To establish a breach of this covenant of good faith and fair dealing, a plaintiff must present "substantial evidence that the other party acted in bad faith or engaged in unfair dealing."

*Id.* (citing *Morton v. Hearst Corp.,* 779 S.W.2d 268, 273 (Mo.Ct.App.1989)).

■■■ Mosby argues that the contract gave it unfettered discretion in deciding whether to promote and market the publications by modifying the term "commercially reasonable efforts" by the term "as it deems appropriate." Spilman argues that those words "as it deems appropriate" only apply to the separate obligation to "license the publications," which immediately precedes the words In order to avoid rendering the term "commercially reasonable" meaningless, I conclude that Spilman's construction of the contract makes more sense, particularly in light of the structure of the deal which pegs larger royalties to net revenues up to a $2,000,000 benchmark. While the contract clearly places the final decision as to promoting the publications in Mosby's hands, this does not absolve it of the duty to act in a commercially reasonable fashion. To the extent the contract is fairly open to more than one interpretation, the Court must construe the language against the party which prepared it, in this case Mosby. *See Empire Gas Corp. v. Small's LP Gas Co.,* 637 S.W.2d 239, 247 (Mo.Ct.App.1982).

Next, Mosby argues that Spilman's breach of his representations and warranties as to his copyright relieved it of its performance obligations under the contract. Specifically, it claims that Spilman misrepresented that he was transferring valid copyrights in the publication in their entirety. However, the Agreement itself acknowledges that portions of the publications were in public domain, and the business plan for Eliot Press acknowledged the publications were not copyrightable in their entirety. Mosby also argues that Spilman made various statements which now estop him from disputing that Mosby had discretion not to publish these works. However, acknowledging that Mosby was "never under any formal obligation to publish" publications like the Red Book is not tantamount to a waiver of commercial reasonableness.

## IV. ORDER

For the reasons herein, defendants's motion for summary judgment (Docket No. 30) is **DENIED**